If you were here at the beginning of arguments this morning, you heard me say that Judge Hull determined he needed to recuse himself. The recusal was at such a time that another member of the panel could not be adopted under our random selection process. We will decide this case as a quorum if we can. It is a disagreement among the two of us, between the two of us. My guess is this will have to be reassigned to another randomly chosen panel as opposed to pulling in a third judge. Who that third judge is would affect the outcome very much so. I would anticipate that the two of us will be able to agree, but if we don't, we will let you know where things stand. So with those hopeful words, I call this case United States v. Hinds County Board of Supervisors, Mr. Morsani. Good morning. May it please the court. Yes. Congress enacted the PLRA for the specific purpose of ousting the judiciary from the business of prison and jail management. That fact was lost upon both the government and the district court in this case, and nowhere is this more evident than in the two primary decisions at issue here today. The first involves the district court's refusal to terminate a consent decree as required by the PLRA, where the government did not prove the county's current and ongoing deliberate indifference. The second involves the district court's decision to take control of the county's jail, give it to a receiver under circumstances that did not satisfy the PLRA. Both decisions are the product of government and judicial overreach, the likes of which we have not seen in the post-PLRA world, and both decisions should be reversed. Let me start, though, with the way you phrased the receivership point. Do you accept that under the right factual circumstances, a receiver can properly appoint it under the PLRA? It could, Your Honor, if it's such a case, but I wanted to . . . I do, Your Honor. All right. Proceed. I do, Your Honor, and the reason begins with the fact that the district court misapplied both the Eighth Amendment and the PLRA in this case. There's two primary points of dispute here with respect to the termination issue. The first is whether the government proved a current and ongoing substantial risk of serious harm at the facility. The second is whether the government proved the county was deliberately indifferent in a current and ongoing basis to that risk of harm, and here, this court in Castillo said that current and ongoing refers to the time of termination proceedings, not past issues and not future, potential future problems. It's the time of termination proceedings. The district court here didn't focus on the time of termination proceedings, did not limit its focus to that time, Your Honor. One of the arguments in the brief is relying, I think, on Castillo that there's some six-month rule that evidence only within six months of the latest evidence you're hearing, the government says there's no such rule. Do you recall the part of your brief I'm talking about, and where does that come from? I do, Your Honor, and that's coming from our attempt to make this case consistent with Castillo's instruction. So it's not in the case law. It's explicitly. You're just saying that's a rough way to look at what these cases are talking about? That's exactly right, Your Honor. That's our to comply with Castillo's instruction that you have to focus on termination proceedings, and here the termination proceedings lasted from the time of our termination motion, roughly January 19th of 2022, until the time the receiver was imposed, which was the middle to end of July of 2022. That six-month period is the termination proceedings. It's a lot better, Your Honor, than what the government's proposing is that there is no time on current and ongoing, and so we proposed the six-month period. Now, the key point here is that if the county was not deliberately indifferent in a current and ongoing basis, the prospective relief had to terminate under the PLRA, and the district court was so caught up with risk of harm and decree compliance that it overlooked the crux of the deliberate indifference inquiry, which is whether the county responded and responded reasonably to the risks of harm at the jail. The evidence in this record is, the record is full of evidence showing the county's reasonable responses to the risks of harm identified by the district court. You take staffing, for example. The monitor testified, well, the county has a dedicated staff recruiter for the jail, and the monitor testified that the county's hiring enough staff. The issue is retention, and to that end, the county has made it easier for staff to get paid by going from monthly pay to bi-weekly and paper checks to direct deposit. Isn't there some evidence that had not, all of that had not been implemented yet, and regardless of your hiring, as you say, detention's a problem, and I think Judge Reed said, I think it was the 58 percent applies to, that only 58 percent, perhaps, of the staffing that had been agreed to in the consent decree was there, so something's being done, but why isn't it a fair assessment by Judge Reed that it's not been successful, and that starting with staffing, which he seemed to believe, or he did say was the foundational problem from which so much else comes, that staffing remains the problem that was when all this began. Why is that not evident? Why is that evidence missing from it? Why do you say that evidence is missing from the record? Well, Your Honor, it's not that evidence is missing from the record. Our point is that there's evidence that was ignored in the record by the district court. There's evidence that the sheriff and others have tried, but isn't there also evidence that it hasn't succeeded? Yes, Your Honor, there's evidence that the staffing is low levels. I'm not here to contest that, but my point is that under Farmer v. Brennan, the district, the Supreme Court stated that officials who respond reasonably to the harm cannot be deliberately different, even if the harm is not ultimately averted, and the staffing would be a perfect example of that. They're not turning a blind eye to the low staffing issue. They're raising the pay. So you're basically saying staffing could remain, I'm not trying to make this sound worse than it is, staffing could continue to be extraordinarily low, creating all sorts of problems at the district level, and the district is trying, ineffectually, maybe because it can't be fixed, there's no right for relief in this case. No, Your Honor, that's not what I'm saying. What I am saying is that the response that has to be examined, whether it's reasonable or not, the Supreme Court states we're not focused on whether it's successful or not. We're focused on whether that response is reasonable. This is directly in line with the Eighth Amendment. It does not require perfect implementation. It requires reasonable responses, and the district court never assessed the reasonableness of that response. Was there any evidence, would you say, there was any evidence to explain why staffing can't be fixed? Is the pay just too low? I mean, is there anything like that in the record? And to the extent the receiver is supposed to fix it, what would the receiver do that the sheriff hasn't already tried? Is there anything like that in the record? Your Honor, there is evidence touching on those points, Your Honor, but not directly on point. No, the evidence showed that the $31,000 raise for starting pay, that was something the monitor raised to $31,000. Yes, Your Honor. It was a raise to $31,000. That was something the monitor and the county agreed that's where the pay needed to be. So all the parties agreed that was where it needed to be. Another example, Your Honor, is that there was no testimony that the receiver could bring staff in magically, you know, wave a magic wand, whatever it may be, and bring staff in. He was going to have to face the same problems that the county was facing in the sense that Mississippi is near full employment. The county certainly is not the only employer that's looking for employees as well. And so, Your Honor, this was all evidence in the record that was never considered, you know, in the big picture by the district court. And then to your point about staffing, there's other things the county's doing as well to respond reasonably because it's true the staffing was low. But, Your Honor, the county's pouring more than $3 million into this facility to improve the premises, to make cell door locks work, to fix lighting, to fix toilets, the HVAC system, the facility roof. I could go on, Your Honor. The point is the district court never assessed these type of efforts as to determine whether or not they were reasonable. Didn't Judge Reeves assess that, yes, these things were done, some of the things you just mentioned, the fixing of locks and whatever, but because of the abysmal staffing levels, none of that works because the inmates are just under proper supervision. They could destroy what's built in almost no time. And I've, you know, worried, I forget who used it, wasteful expenses of resources. I don't know if that's a fair assessment or not, but at least there's something to that, that until the staffing's taken care of, none of these other things that the sheriff and others have tried to do, the board of supervisors, your client, can work. Your Honor . . . We're talking about Judge Reeves' opinion and his findings. That's my sense of what he's saying in his opinion. Do you have a response to how far off base I am or him, either way? No, Your Honor. I think, though, that gets at the heart of our point about the Eighth Amendment. It doesn't require that that staffing be 100 percent. It just requires the county ignoring the problem, and the county was not ignoring the problem. They were taking steps, approving overtime for all law enforcement officers to work inside the jail. The sheriff created and proposed a step plan to increase the . . . to help increase or address the retention issue. These things, Your Honor, were reasonable efforts, just in the line of this court's decision in Humphrey v. Hall that looked at Commissioner Policia Hall's efforts to address staffing in the Mississippi Department of Corrections. It was the same responses. Her efforts may not have had success, but the key that this court looked at was, was she ignoring the problem? Was she turning a blind eye or not? And we could go across the board to these issues that the district court identified. You take segregated housing as another example. The district court placed a lot of emphasis on the placement of seriously mentally ill detainees in segregation, yet didn't acknowledge the county's efforts to address that risk of harm created by doing that. It didn't acknowledge the address their needs and address suicide risks. Before you run out of time, what's your position on the responsibility of the receivership? Whether it's too broad or . . . Certainly, Your Honor. The receivership exceeds anything . . . I'll put it like this, Your Honor. There's no limiting principle to that receivership on federal power. There's no limiting principle whatsoever. The receiver has complete and total control of the jail, has complete access to the county's budget, has . . . it's true the county . . . the district court called them checks and balances, but all the county can do at most is object to the receiver's commands as to what it may want or not want in the facility, and then that objection goes to the district court and the same individual who appointed this same receiver. And so, Your Honor, we take the county . . . there are no reasonable limitations on the federal power in the district court. And frankly, it really . . . the receivership, Your Honor, is inappropriate. If I can take a step back on that, it's inappropriate as a procedural matter as well. Let's just think about what the district court did here. The district court . . . the night of the current sheriff's elected, the district court issues an order threatening to take over the jail and appoint a receiver because of the noncompliance with the consent decree. We responded to that, and then we subsequently moved to terminate the consent decree. The district court agreed with us that the majority of that consent decree exceeded constitutional minimums, terminated the consent decree saying that 63% of the provisions exceeded the constitutional requirements, imposes the new injunction, and then yet less than four months later, imposes the receiver as a final sanction for contempt of that consent decree that it terminated as exceeding the constitutional minimums. We terminated but left a fair amount, less than half, but a fair amount in place. I mean, why . . . I'm not saying you're wrong, but as a . . . on the facts, but as a legal matter, what would be the problem of the court saying this . . . these other requirements have been in existence ever since the consent decree was formed in that way. Your violations of those show the need for the receivership. The fact it was only six months or four months, whatever you said in between, wouldn't seem to matter so much as those conditions had those impositions of those requirements that existed for a long time. The problem with that, Your Honor, is the district court itself acknowledged that the new injunction was a lesser burden. It was an easier burden to comply with from the county's perspective, yet didn't give us any time to comply with that. It never found us in noncompliance with the new injunction, and yet imposed the receiver as a sanction for a decree that it had terminated as going too far. Let me ask, Counsel, were we to agree that there was significant evidence in the record of various violations? Is there a lesser remedy, not that you would invite, but that would be a lesser remedy? Perhaps, Your . . . there is, Your Honor, and perhaps this The county has already done that. The county has closed APOD on its own without any intrusion by the government. The county was able to get it closed, and this court could require that the county keep APOD closed, and then once RDC is replaced, then the entire operation would move to the new state-of-the-art facility that the county's building at the cost of $123 million. That would be one remedy, Your Honor, and I think that goes to show, too, the critical importance that we can't lose sight of. Once the federal receiver . . . I'm sorry, once the consent decree and the new injunction were stayed, the county was able to get APOD closed without any federal oversight, and I think that goes to show that, coupled with the fact that the county's constructing this new jail that was not required by the consent decree, that shows the county's doing everything it can to address the needs of its detainees and its detention officers in that facility, and then just another point about the receivership, if I may, Your Honor. There's a PLRA problem here, too. There's two PLRA problems. The first is that the district court made no effort to address the proportionality as required by Brown v. Plata between the receivership and the remedy it sought to remedy by the receivership. The district court's order does not identify constitutional violations with any specificity. That's the first problem with complying with Brown v. Plata, but the second is that it does not then tie proportionally that secondary problem, Your Honor, is that the district court imposed the new injunction as the least intrusive means, and then less than four months later imposes the receivership as the least intrusive means. You can't have it, something's either least intrusive or it's not, so it's not a good thing. Good morning, Your Honors. Katherine Lamb for the United States. I'd like to talk a little bit about how we got here and why this is the kind of case where a receivership is justified under the precedent in Brown v. Plata, which expressly talked about the availability of a receivership, even in light of the requirements of the PLRA. So for a decade, Hines County has known about the abysmal conditions in its jail, which include violence, chaos, squalor, excessive force, over-detention, and it has had chance after chance to fix that. Two negotiated orders before the court, extra time to right the battleship, as the county put it, and it never has done so. The district court was faced simultaneously with persistently unconstitutional conditions in the jail, the county's clear contempt of court orders, and yet in the face of this, their plea to terminate relief. The district court, in our view, patiently and deliberately took up its duties under the Constitution and the PLRA to impose an effective and practical relief package that is tailored to the case's record and history, and to ensuring that after years of the county's broken promises, the people of Hines County will have their Eighth and Fourteenth Amendment rights respected. So this court should not now be able to use the county's tactics and obfuscation to allow it to escape the consequences of those broken promises and actions and inaction, and that should be alone enough for this court to affirm the district court's orders. Now, I'm... Well, you do accept that the receivership, with whatever modest exception you may want to say, takes over control of the jail, including the funding, including setting perhaps salaries for people that drive them through to Judge Reeves. Would you agree that's how this receivership... So the receivership, as designed, does put the receiver in day-to-day control of a single jail facility, so that's the Raymond Detention Center, which the county says it is slating for closure. So the receiver would have day-to-day control over that facility, its budget, staffing decisions, etc. It would have to file, though, a plan of action to which the county has the ability to make a counterproposal and other steps... Everything in control initiates these sorts of things, subject to objection, ultimately resolved by Judge Reeves. So it does seem to me that it is essentially a total takeover of that facility in Raymond. One of the interesting parts, I thought, receiverships are an extraordinary remedy. PLRA frowns on them, very large frown, I think, and so we need to work with those restrictions. One of the, it seems to me, key points I saw in Judge Reeves' opinion is he says that the fundamental problem out there is staffing, and I'm not sure why the receiver can do a better job of getting the staff levels up, but regardless, is there not some way less than the receiver just to focus on staffing? Well, Your Honor, the district court did look at a variety of less restrictive alternatives in its order and also pointed out that the county, at the time of the mitigation hearing, had not offered any other less restrictive, any lesser measures such as staffing, as the court is now suggesting. However, what we do know from this record, and looking back to your discussion with my colleague about staffing, is that the county is absolutely incapable of handling this problem. Could it be that they have shown it can't be done? No, Your Honor, I certainly don't think so because the county really had not taken the steps to which it committed back in 2016 and recommitted back in 2020 and hadn't even completed, as we outlined in our brief, by the time we got to the hearings in 2022. So, for example, that $31,000 pay increase that my colleague referred to, that was not in place at the time of the termination hearing. I believe it had finally come into effect as of the mitigation hearing in July of 2022, but even at that point, the monitor's reports indicate that that that raise was thousands of dollars less than market rate at the state's facilities nearby, and we also know that the other steps that the county had acknowledged it had to take as far back as the consent decree regarding a career ladder, regarding retention pay, the things that keep people in their job, the county had never taken those steps, even though they were planned. So, in your view, and I think Judge Reed's view, the receiver will alter that by setting a pay scale for these employees out there, wherever they are, at a more attractive rate, maybe competitive rate, whatever else, that those sorts of measures will start to be taken with the implementation process set out and the receivership going to the board, having the objections, Judge Reed's ultimately resolving it. That's how this is going to work. So, I think to the extent that the court is, has questions about whether a receivership, or there simply could be a remedy with respect to a career ladder, I don't think it's going to work. I don't think it's going to work in the  Raymond Detention Center. The evidence here shows that there are system-wide deficiencies at the Raymond Detention Center. So, while staffing and supervision are at the heart of those problems, the district court laid out evidence as to a variety of problems relating to the use of force, over-detention. Looking at the most narrow, effective way, least intrusive way to correct the problems, that if we accept they exist out there, and there's certainly a lot of evidence that's been introduced, whether it's timely, whether it shows ongoing occurrence or not, obviously is an issue. But I think it is our obligation as well as Judge Reed's to figure out what is the most narrow, the least intrusive way to deal with this. And is there something between a total takeover of the jail, if you want to reject that label, that's fine, but it looks to me like a total takeover of that facility. And dealing with staffing in some way, is there some way to deal with what he called the, he did call it fundamental, but essentially called it the fundamental problem, as opposed to taking them over to jail? Well, Your Honor, I think this is the kind of case where the degree, the breadth of problems that were identified in the court's hearings, and the system-wide nature of their problems, so the failures of leadership, the failures to enact policy, to enact reporting across the boards that prevented the continuation of ongoing harm in terms of violence, use of force, over-detention, do require a higher level, a higher level change than simply looking at staffing. And one of the court's core concerns, looking at the course, the long and unhappy history of the litigation, as the Supreme Court has put it, was problems with leadership and failing to take consistent actions that would actualize all of the steps the county had agreed were necessary. I think it's also important to keep in mind that while Judge Reeves did acknowledge that this was a significant, um, a significant role that he was giving the receiver, the receiver's duties are tied very specifically to effectuating the court's orders as to achieving un, achieving constitutional conditions in the jail. So this was a receivership designed to correct the specific problems that motivated the district court's findings as to, um, the, the types of unconstitutional conditions and their causes. So the receiver was to be carrying out the new injunction, which focuses on the core issues with which the court is concerned. So while I don't think we can, uh, we can avoid the, the notion that this is a substantial remedy, it is one that is tailored to this case and to the violations that the district court found were persistent over, um, you know, seven years, 10 years, a very, a very long time that the county had not managed to take care of. Well, you have said, I'm sorry, go ahead, Judge. Does the staffing problem, um, does that mean that you just don't have enough employees or that the employees you have need to be, uh, replaced or properly trained or given responsibilities? How, why is that? Well, so Your Honor, um, the problem in the case there, the county certainly seems to say that it's hiring plenty of people, but not retaining them. So there's certainly a problem as to retention as to the quality and training of the staff that certainly was established to be a serious problem as well. Um, in terms of ensuring that individuals who were hired were given the tools to carry out their jobs, um, in a constitutional manner. So to not use excessive force, to take proper steps when someone is in harm, to check in on detainees who are suicidal and are in isolation units. So there were problems not just with the, the getting bodies in the door, but keeping them in the door and ensuring that they were carrying out, um, this, the county's obligations with respect to the people, um, who are in its care. So that too, I think Your Honor would speak to the need for a receivership in this case to address the system wide failures and the county's persistent either unwillingness or inability to take the steps it had agreed were narrowly tailored to achieving the constitutional standard sort of substantively as to what folks need to live in a habitable jail. Is the receiver the proper person to do that or do you need a different receiver? Well, certainly if, if Your Honor's question is about the particular receiver that the district court identified here, which was Mr. French, um, that person we certainly deem acceptable and the qualifications or abilities of Mr. French to carry out, uh, excuse me, Mr. France to carry out, uh, those duties. So Your Honor's, um, if I can go back to one point that my, um, or there are several points that my colleague raised that I think might, uh, merit some discussion here and I'll just try to go through a few of them if that's helpful regarding that, um, six month rule that my colleague mentioned. Certainly there's no basis for that in the case law. Well, but there is a need for current information. Yeah, absolutely, Your Honor. Proposing six months, maybe not completely out, out of line, but, um, I mean, one of the things you argue in your brief is under the eighth amendment, uh, substantial risk of, of, of, uh, harm is, is relevant and no doubt it is, but that has to fit also into current and ongoing. Excuse me, Your Honor, I'm- Also has to fit within the concept of current and ongoing. Oh, yes, absolutely, Your Honor. So a couple of points I want to make in addition to the fact that that sort of rigid rule has no basis in law. Um, the evidence that was taken here was about as fresh as it could be. The district court got the termination motion and held a hearing, an evidentiary hearing two weeks long on current conditions in the facility that was, that January to early February, including the court. So the idea that the evidence before the court was somehow in the past, that just doesn't, that just doesn't hold. Um, as for citations to the record that, that fell within the previous year, the vast bulk of what the district court talked about was from that six month period. So July to January or what have you, when the county actually moved for termination. So- The issue with specific events of use of force, uh, the terrible fact that some deaths have occurred out there, there does seem to be a real chronology we can look to for those, and some of those are out of recent times. Uh, what's your response to, did Judge Reed have in front of him evidence of recent, uh, failure of training on use of force and, and off the desk, I mean, I would say anything you got out of newspapers or whatever else that shows what's happened out there recently are not particularly relevant for us. But insofar as what's in this trial record, what is there about deaths? What is there about use of force that would be considered current and ongoing? Yes. So, and I think we highlighted some of this in our brief, but the monitor, monitoring team, the monitor and her team testified about the persistent failure to train up to the time of the hearing. And the monitor's report, as we referenced in our brief, identified multiple incidents in the prior three months of, uh, officers using pepper spray inappropriately, for example. The monitor, uh, the monitoring report and the testimony at trial also was that there had been incidents involving, um, investigators' use of tasers without justification. Um, and then against this, the jail administrator's insistence that there not being the introduction of tasers without further training, and the sheriff overriding that. So we see a picture in the present moment of instances of serious harm, of, excuse me, excessive force actually happening, and then the policies that permit that, truly in real time. So there was a very, we think the record was amply sufficient there, and the county is really just asking this court to resort the facts, which is not proper. So, Your Honor, I think we've discussed a bit as to deliberate indifference. Certainly, it's not the case that the, uh, the court overlooked any of the evidence that the county has put forth here. And we think it's, it's quite important also to keep in mind that this is a case where the sheriff and the Board of Supervisors president both testified that the facility in question either was wholly or in part unsafe. And yet it continued to be unsafe. So we think it's important to keep detainees there. And if that's the case, that's, that's about as textbook deliberate indifference as I think we can get. So it's very hard to imagine where the county is essentially asking this court to, to resort the facts that the district court made a clear mistake, um, under such circumstances. Um. Let me ask you on the receivership, do you accept applying the plateau factors and figuring out whether that's the right decision to make? Do we think those were the proper factors? Yes. We, I think those are proper factors for assessing the need for a receivership in, uh, in the post PLRA era for a couple of reasons. First off, the county has charged here, we think incorrectly, that the district court didn't apply the PLRA when it imposed the receivership. Certainly it did. It looked to all the key post PLRA Supreme Court precedent and applied that. When you look at the, the plate of factors specifically, what they do is, I think, figure out whether there is any alternative possible, but a receivership that would solve the ongoing constitutional problem. And the, the decision in plateau one, which is where those factors come from, it expressly incorporates the PLRAs need narrowness intrusiveness requirement in factor two, which is that less extreme measures factor. And then the court also at the end of its analysis reiterated that that is what its remedy was designed to achieve was PLRA compliance. Um, while the Supreme Court in Brown versus Plato did not expressly affirm those factors, it did talk about the Plato one courts assessment of the problem, including its analysis of that less intrusive means factor. And that's at, I think, five 25 to five 26 of the Supreme Court's decision. And it refers back, um, to that second factor discussion. So we think that's a very appropriate and helpful way of assessing the need for receivership specifically in, in the PLRA framework. What examples at the circuit court level are there of approvals of receiverships for prisons, jails, such facilities? So Your Honor, if we're talking about the post PLRA era, which I think, I think we are, um, the, the examples that I would point the court to are, do actually come from Plata. So in Plata to the ninth circuit, it didn't affirm the initial imposition of the receivership, but it affirmed the district court's denial of the state's motion to terminate that relief. So we have that. Um, and then as for, I don't know if there are other examples of receiverships, but another example that I would point the court to is the first circuit's decision in Morales Feliciano. That's also cited in our brief. That wasn't a receivership, but it was privatization of correctional health care in Puerto Rico. And there too, the first circuit affirmed the district court's denial of a motion to terminate that relief. So not exactly the same, but similar. Was it still a PLRA case? Yes, that was a PLRA case. And I, I think Your Honor, there are historical examples of receiverships in this context, but to be, to, you know, this is, it is a rare and serious remedy that is appropriate for rare and serious cases. And that's, and that's what this is, Your Honor. Um, this is not, as the county suggests, some sort of program of government overreach. The reason there aren't a lot of cases is this is not something that is usually done and it's justified by the record here. Um, there was a suggestion that there was some impropriety in terminating the consent decree and then holding the county, um, appointing the receivership, the receiver as a remedy for contempt. I think your court understands why that does not hold up, but I think it is important to keep in mind that the consent decree never was terminated. It simply was narrowed and its substance remained. And in any event, the court made clear in imposing the receivership that it was doing so expressly because the county had failed to abide by its constitutional obligations. Do we have any issues in front of us that need to be resolved other than as they apply to the Raymond facility? Are there cases to be resolved? Any other facility because the Henley, I forget what the other name is, Chet Henley, the other name on that facility is, has been mentioned in the briefs. Is there anything on any other facility before us or is it just a Raymond? Well, Your Honor, the district court did reimpose a few provisions as to the Henley Young facility. The county has not, um, argued on appeal that anything was inappropriate in that regard. Um, significantly though, and this would go back to my colleague's arguments about deliberate indifference. The court did not find deliberate indifference as to the work center, which is one of the other facilities, and it released that from the consent decree. The receivership is limited to power over the Raymond detention center. All right. Thank you. Um, thank you, Your Honors. And of course, we ask that you affirm on this record and history. Thank you. Your Honor, my, um, friend on the other side mentioned, um, you know, the people of Hines County and the receivership is a complete takeover of the jail. It's an affront to self-governance, uh, by the people of Hines County, and it's, it really is an extraordinary example of the district court's unwarranted mistrust of the, the people of Hines County and their elected representatives. Now, and we certainly believe that our system of federalism demands more, uh, than that receivership, uh, imposes. Now, now the couple points, the receivership itself, Your Honor, the scope of it, uh, drastically exceeds PLATA v. Brown. PLATA's, the receivership in PLATA was limited to the medical care delivery system. It, it was not, uh, a complete system takeover, which is what our receivership, uh, is. Our receivership also gives the, the receiver complete access to the county's budget. There was some testimony, there was some questioning about staffing and increasing staff salary. If the receiver comes in and says, I'm going to take this money and apply it and raise salaries up to $50,000, the county operates on a, on a very finite budget, and it's only getting smaller as the testimony showed because we have a shrinking tax base. The . . . Counsel, we have constitutional violations out there according to Judge Reeves. Something has to be done about that, and obviously the county has a lot of other obligations. Paving roads would be nice sometimes, uh, but the county must deal with constitutional violations. I think a fair interpretation of this record is that some things have certainly been tried over the last six years or however, however long that this litigation's been going on, but they haven't been successful to eliminate much of the significant constitutional violations that are occurring. And your defense has been, properly so, that the, the sheriff is trying, there's not been deliberate indifference, whatever else you want to say. So, I mean, I'm very concerned about the receivership aspect of it, but I'm also very concerned about the significant constitutional violations that the judge who spent an awful lot of time with this case found. So, I don't know if it's about the people of Hines County, but it is about the people in that jail who need to have their rights protected. And, your Honor, if indeed there are . . . One minute of speech, you may have come out as one, but I wanted to say there's a balance here that we have to deal with. And I think that balance, your Honor, has to be run through the PLRA's need, narrowness, intrusiveness test. You've got to have proportionality, as the Supreme Court talked about in Brown v. Plata. That was never done by the district court in this case. It imposed the receiver as the least intrusive means, and word only, less than four months after imposing the new injunction as the least intrusive means. The district court had to run it through the PLRA analysis. The government agrees, and they caught the error, and the district court obliged by accepting their invitation to correct that error post hoc, went on limited remand. But just not having the findings, you mean, on narrow, intrusive . . . Yes, your Honor. The district court referred to that as the magic words. But it's a serious requirement of the PLRA. It's the need, narrowness, intrusiveness analysis. That perspective relief, the Congress made the decision, that perspective relief in the context of prisons and jails is not going to go on indefinitely. It's going to have to be narrowly tailored, the least intrusive means necessary, to remedy the violation proven. And here, the district court claimed that . . . it found that there were constitutional violations, but never defined them with any specificity, making it very difficult to conduct that need, narrowness, intrusiveness analysis. But either way, your Honor, the PLRA requires that relief to be narrowly tailored and the district court has to be able to do that. I asked you before, and you basically said there were no constitutional violations because there's no deliberate difference. I asked opposing counsel as well, what is a lesser remedy here if we find these violations are actually occurring? And I don't know if it's focused just on staffing. I don't know if it's a master rather than a receiver, whether it's something else. But it does seem to me that the DOJ attorney is correct that you haven't offered another alternative and I don't know if you presented one to Judge Reeves. And so, receivership of trying to take on the problems that he perceived that we have to determine if they're really there and really show constitutional violations, once he found those, he had to do something. And it doesn't sound to me like you offered an alternative. We did offer, your Honor, the idea of closing APOD. We told the district court we were working on that. We were trying to line it up. And we have accomplished that now that the matter was stayed. We accomplished it during that time, your Honor. I have closed APOD. That's one remedy. We also proposed a lesser intrusive, much lesser intrusive receivership that the district court, by what we can tell, did not consider. Keep going. Could you still answer my question? Judge Clement asked you, I think, if I recall who she was asking, to address the breadth of the receivership and that's something we'll be looking at. So, anyway, do you have any other . . . If I could just briefly address the breadth of it, your Honor, with a couple minor points, I would be glad to do that. Address the what? The breadth of the receivership with a couple points. Important. Go ahead. It's a complete and total takeover and it goes on without end. The district court said that, yes, the construction of the new jail is a likely point that it could end, but if you look at the order very closely, he says it does not end until the constitutional violations are resolved and there's compliance with my orders. And, note, he does not identify what those orders are. This receivership could go on indefinitely. Well, you'll be in court if it does and see if you can get that changed. Thanks to both of you for helping us understand this case. I certainly hope we can get you a decision and get you one in due course. Thank you, Your Honor. We are adjourned.